# EXHIBIT 1

FOR OFFICIAL USE ONLY



# Fiscal Year 2018 Border Security Improvement Plan

*December 21, 2018*
Fiscal Year 2018 Report to Congress


Homeland Security

FOR OFFICIAL USE ONLY

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.



# Fiscal Year 2018 Border Security Improvement Plan

## Table of Contents

| | | |
|---|---|---|
| I. | Legislative Language | 1 |
| II. | Background | 3 |
| | A. Border Security | 3 |
| | 1. DHS Border Security Enterprise | 3 |
| | 2. U.S. Customs and Border Protection | 6 |
| | 3. Border Security Challenges and Opportunities | 7 |
| | 4. Border Security Improvement Plan | 13 |
| III. | Border Security Improvement Goals and Objectives | 15 |
| | A. Goal 1: Enhance understanding of border threats and risks | 15 |
| | B. Goal 2: Strengthen enforcement operations at the border | 18 |
| | C. Goal 3: Lead a resilient network of border enforcement capabilities | 20 |
| IV. | Border Security Initiatives and Implementation Plans | 22 |
| V. | Ensuring Accountability in Border Security | 32 |
| | A. Measuring OPCON and Security at the Immediate Border | 32 |
| | B. Border Security in the Air and Maritime Environment | 33 |
| | C. Border Security Measures at the POEs | 33 |
| VI. | Conclusion | 36 |
| | A. Future Planning | 36 |
| | 1. Mitigating Outside Influences | 36 |
| | 2. Immigration Reform | 37 |
| | 3. Consultation | 37 |
| VII. | Appendices | 39 |
| | Appendix A. List of Acronyms | 39 |

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Appendix B.  List of Open U.S. Government Accountability Office (GAO) and Office of
Inspector General (OIG) Recommendations Regarding Border Security ................... 42

v

WARNING:  This document is FOR OFFICIAL USE ONLY (FOUO).  It contains information that may be exempt from public release under
the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance
with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel
who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-006

# II.  Background

## A.  Border Security

Securing America's borders is an essential element to promoting economic prosperity and physical security for our citizens.  Our borders present unique challenges because the border is a complex environment with a diverse array of constantly and rapidly evolving threats.  Some of these threats and challenges include terrorism, transnational crime, illegal immigration, counterfeit and unsafe goods, agricultural pests and diseases, narcotics smuggling, human trafficking, and the outbound transfer of prohibited weapons and illicit bulk currency.

Security of our Nation's borders is a critical mission for DHS, and it is a mission based on three foundational elements:

- Knowing what is happening in the border environment,
- Having the ability to act or respond to that knowledge, and
- Cultivating partnerships that enhance knowledge and the ability to act.

These three elements form the foundation of all strategies and activities across the Department's Border Security Enterprise.  Increasing our capabilities and capacity in these three areas improves DHS's security posture along our borders.

### 1.  DHS Border Security Enterprise

DHS leads a broad network of border security capabilities across the Federal Government and beyond.  Security of our borders cannot be managed as a finite perimeter, but must include a system of layers of security that start beyond our borders and extend to the interior of the United States.  The array of border security capabilities employed by DHS and our federal, state, local, tribal, and international partners enables a holistic approach to preventing the illegal entry of people, drugs, and goods across the Southern Border, Northern Border, and the maritime approaches to our shores.

The following are some of the major capabilities and activities employed by DHS in its layered approach to border security:

International Engagement:  Effective border security begins in source and transit countries.  Substantial, sustained success requires cooperation with federal partners, foreign governments, and other international partners to prevent illegal pathways and networks that fuel violence and corruption.  Building cooperative and mutually beneficial security relationships also will facilitate the legitimate flow of people and goods.  Working with the U.S. Department of State (DOS)—which leads U.S. international engagement—DHS supports U.S. efforts to promote

FOR OFFICIAL USE ONLY

WARNING:  This document is FOR OFFICIAL USE ONLY (FOUO).  It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-009

source country economic development and political stability, to negotiate agreements to achieve joint policy goals, and to issue visas for eligible applicants who seek a lawful pathway for entry into the United States, among other activities. This international engagement includes law enforcement capacity development in both source and transit countries.

Throughout the world, and particularly in the Western Hemisphere, DHS implements:

- training courses;
- capacity-building programs;
- information-sharing activities;
- joint operations with partners in law enforcement, aviation security, customs regulation, border enforcement, cybersecurity, and countering violent extremism; and
- humanitarian support related to mass migrations, trafficking in persons, and emergency response.

Additionally, DOS and DHS jointly strive to negotiate removal agreements, necessary for the repatriation of aliens subject to final removal orders, from both willing and recalcitrant source countries. In fact, DOS has granted DHS authority to enter into agreements with other nations as the Department seeks improved operational integration and coordinated interdiction of illicit drug smuggling and other illegal activities.

Transnational Criminal Organization (TCO) Dismantlement: Reducing transnational organized crime and associated illegal activities are key elements of the plan to improve border security. TCOs vary widely in their size and nature; ranging from large, diversified cartels, such as the Sinaloa Cartel, to small, specialized organizations focused on a specific area or function. Specific types of TCOs include drug trafficking organizations (DTO) and alien smuggling organizations (ASO). DTOs are typically large, complex organizations with highly defined command and control structures that produce, transport, and distribute large quantities of one or more drugs. ASOs, in contrast, are typically smaller organizations that operate separately or independently from, but under the jurisdiction of, larger TCOs controlling specific territories.

Countering these TCOs is a national security priority for the Administration, and a major focus of DHS's efforts to improve border security. Working with its partners, (b) (7)(E)

(b) (7)(E)

Border Enforcement: DHS apprehends or arrests potentially removable aliens, criminals, and suspected terrorists and interdicts dangerous and illicit goods while facilitating lawful trade and travel. The Southern Border and approaches and the Northern Border are vast and encompass diverse geographic regions cutting across domains, jurisdictions, international boundaries, and enforcement activities. Given this complex environment, direct enforcement of U.S. laws is

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.
BSIP-010

challenging and requires cooperation from a wide range of federal agencies and international partners, as well as support from state and local law enforcement partners. Law enforcement activities within the Southern Border and approaches and the Northern Border are the foundation of border security and represent the largest investment of DHS resources. U.S. Customs and Border Protection (CBP), U.S. Coast Guard, and U.S. Immigration and Customs Enforcement (ICE) are the primary law enforcement agencies responsible for border enforcement.

Consequence Delivery System: Under Section 8 of the U.S. Code, it remains a crime to enter into the United States at a location other than a designated port of entry (POE). Border security requires imposing consequences on illegal border crossers, traffickers, and smugglers, along with timely adjudication of applications for relief. (b) (7)(E)

(b) (7)(E)

(b) (7)(E) In addition to imposing administrative consequences (removal), criminal consequences such as federal prosecution are also necessary to deter repeat offenders from continued illegal entry attempts. Apprehended illegal aliens may apply for lawful immigration benefits (asylum or other forms of relief, including protection from removal), but these applications must be adjudicated thoroughly to ensure that benefits are granted only to those who meet legal eligibility standards, while preventing the exploitation of immigration benefits by those who seek entry through fraud and deception.

Working with its partners, DHS imposes a range of consequences on aliens arrested for attempting illegal entry across our borders. The systematic delivery of consequences is most developed in the land domain between POEs through the U.S. Border Patrol (USBP) Consequence Delivery System. Although these consequences involve border apprehensions by DHS, the application of these consequences relies both on DHS and Federal Government partners at the U.S. Department of Justice, including the Executive Office for U.S. Attorneys, the U.S. Marshals Service, the Executive Office for Immigration Review, and the Federal Bureau of Prisons.

Interior Enforcement: Resilient border security also relies heavily on DHS's ability to enforce immigration laws within the interior of the United States. Effective interior enforcement must eliminate the expected benefit of illegally entering, or illegally remaining longer than permitted, in the United States, which, in turn, will deter other aliens from attempting to enter the United States illegally or from overstaying their authorized period of stay. The motivation of these illegal aliens varies and include higher wages, family reunification, quality of life, and criminal gain. Furthermore, some illegal aliens are able to illegally gain employment without verification of employment eligibility by employers, or by presenting fraudulent documents to employers who comply with the Immigration and Nationality Act requirements.

ICE is the primary law enforcement agency engaged in a wide range of interior enforcement activities to counter and deter illegal immigration to the United States. ICE identifies, arrests,

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

detains, and removes, from the interior, aliens who either overstayed or entered the country illegally. Specific activities include worksite enforcement; identification and removal of incarcerated criminal aliens; criminal and gang investigations; and partnerships with state and local law enforcement through programs such as 287(g) and Secure Communities. Holding employers accountable for employment eligibility verification is another important, effective element of reducing the incentive to cross our borders illegally.

This document will focus on the efforts of CBP, within this broader context, to enforce the Nation's laws and regulations and to ensure secure control of our Nation's borders, both between and at the POEs.

## 2. U.S. Customs and Border Protection

CBP is the leading law enforcement agency responsible for border security. In this role, CBP manages approximately 6,000 miles of land border and 95,000 miles of shoreline, while also preventing the illegal movement of people and contraband crossing into U.S. airspace. CBP is also responsible for managing the flow of lawful trade and travel through 328 air, land, and maritime POEs.

---

### *CBP Mission Statement*

*To safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel.*

### *CBP Vision Statement*

*To serve as the premier law enforcement agency enhancing the Nation's safety, security, and prosperity through collaboration, innovation, and integration.*

---

Border security is one of CBP's primary missions and is a priority of the highest order. CBP's experience has shown that effective border security must employ an optimized resource allocation strategy that leverages the capabilities of multiple tools, material resources, and people. CBP constantly seeks to enhance its ability to address the three foundational elements of achieving border security: knowledge of the border environment; ability to act on that knowledge; and partnerships that increase knowledge or strengthen action.

CBP increases its knowledge of the border environment through several means, including, but not limited to: information sharing with law enforcement partners, use of advance information to

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-012

identify high-risk passengers and cargo, observation by personnel in border regions, sensor technology, infrastructure, tactical/strategic communications, and intelligence.

Personnel are the primary resource needed to secure our borders, but the ability to respond effectively can be improved through other resources such as: timely, actionable, and relevant intelligence; targeting and analytical systems; biometric identification technology; wall and other physical barriers; border access roads; sensor technology; aircraft, boats, and various types of vehicles; and modern tactical communications infrastructure. Impedance and denial barriers, such as walls and other tactical infrastructure, are essential components of CBP's tactical response along the border; such barriers simultaneously block illegal entry into the United States while also channeling those who would attempt illegal entry into areas where agents can apprehend, detain, and remove them more easily.

Although walls and other tactical infrastructure are the cornerstone of an effective border security strategy, (b) (7)(E) provide agents with additional critical knowledge of the movement of illegal persons and goods. (b) (7)(E)



(b) (7)(E)                                                                      A personnel-only

approach to border security is generally cost-prohibitive when compared with more thorough, integrated designs that augment personnel with infrastructure, technology, and other resources. That said, the hiring of additional Border Patrol Agents (BPA) to support response and resolution remains a critical capability for CBP. Likewise, an approach that is overly reliant on technology dramatically reduces the ability of agents to impede and interdict the entrance of illegal border crossers into the United States effectively, (b) (7)(E)

(b) (7)(E)                                                                      In all, then, it is

only through the effective utilization of a border security system comprising physical barriers, increased personnel, improved infrastructure, and cutting-edge technology that border security can be realized.

## 3.    Border Security Challenges and Opportunities

The constantly evolving and shifting threats and challenges in the border environment require CBP to maintain a level of adaptability that allows the agency to employ the correct mix of tools, resources, and techniques to secure our borders effectively. CBP's experience has shown that actions taken along the border invariably will generate a reaction from those looking for gaps and seams in our security. (b) (7)(E)

(b) (7)(E)

This action-reaction effect will continue to occur, driving changes to the operating environment. Additionally, new threats and challenges will appear when technological advances, geopolitical changes, economic crises, and other factors affect the international community.

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

A combination of infrastructure, legislative, and partnership solutions are required to address these dynamic challenges. First, continued investment in a border wall system is essential as it provides agents with the ability to impede and/or deny attempted illegal entries while creating additional time to carry out a law enforcement resolution. **(b) (7)(E)**

**(b) (7)(E)**

The construction of both new and replacement wall system that incorporates complementary technology and roads is a critical component of USBP's pursuit of operational control of the Southwest Border (SWB).

In addition, CBP remains committed to working with U.S. government partner agencies as well as with the governments of Mexico, Honduras, Guatemala, and El Salvador in identifying and addressing the "pull" factors that encourage people from these countries to enter the United States illegally. While the opportunity to improve their lives is certainly a draw, legal loopholes like those found in the *Flores Settlement Agreement* also encourage individuals to make the dangerous trek from Central America and Mexico into the United States. As such, CBP welcomes the opportunity to work with Congressional leadership to develop legislative fixes to enable the modernization of the Nation's immigration system.

Operational Control

On January 25, 2017, the President issued Executive Order 13767, *Border Security and Immigration Enforcement Improvements*, directing DHS to take steps to achieve complete operational control (OPCON) of the Southern Border. It requires CBP to have effective capabilities to predict, detect, identify, classify, track, respond, and resolve illegal border crossings. To meet these requirements, CBP deploys air, land, and marine assets to patrol and secure U.S. border areas. Executive Order 13767 also set as policy that a physical barrier shall be constructed on the Southern Border, infrastructure that has proven to have a profound positive impact on operational control of the border. Therefore, CBP is pursuing investments in border walls, barriers, and sophisticated detection and intervention systems that enable CBP to reduce the use of terrain for illegal cross-border activity. These assets and systems also allow CBP to develop and sustain situational awareness of threats and associated risks, which is enhanced further by information and intelligence-sharing partnerships. CBP's approach is designed to be nimble, threat-based, and intelligence-driven, allowing threats to be identified as early as possible, responses to be targeted, and resources to be deployed optimally in response to those threats and to counter illegal actions in the border environment.

DHS is developing an OPCON strategy, which will describe CBP's current OPCON of the border and how CBP will achieve full OPCON in support of Executive Order 13767.

Impact of Impedance and Denial

<del>WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.</del>

BSIP-014

CBP explains some of these historical examples in Section IV: Evolving and Maturing Border Investment Strategy and Appendix B: Impedance & Denial Report in the 2017 Border Security Improvement Plan (BSIP). Section IV notes that "from about 2002 to 2008, the USBP doubled in size and investments were made in more than 600 miles of new physical barriers … as a result of investment in physical barriers, the highest risk areas were covered with barriers tailored to meet the needs of those areas as understood at the time."[1] This section notes that this initial investment in barriers and infrastructure was predominantly from El Paso to the West, which was the highest risk region at the time. It also notes that there was **(b) (7)(E)** **(b) (7)(E)** which is now "CBP's area of highest activity, and is therefore a priority focus area for current investment strategies."[2] Appendix B from the 2017 BSIP confirms that the deployment of Impedance & Denial capabilities along the Southern Border forced some threats to "shift from areas where border walls are deployed to target areas with limited or no border walls."[3]



Figure 1: Border barrier deployment 2002-2008

Although CBP's investment strategies are tailored to the current understanding of the threat, they "also recognize that our adversaries will seek to find ways to breach the border over, under, through, or around a wall."[4] Thus, CBP takes a proactive posture in its planning and future-year

[1] 2017 BSIP, Section IV, p. 21
[2] BSIP, Section IV, p. 22
[3] BSIP, Appendix B: Impedance & Denial Report, p. 119
[4] BSIP, Section IV, p. 23

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-015

resource decisions to anticipate changes in border threats based on any actions that CBP currently is taking along the border. For example, the type of barriers depicted in Figure 1 includes "legacy" fencing (shown as purple, light blue, or pink) or vehicle barrier (shown as orange). These types of barriers are not as capable or effective as modern pedestrian walls. Therefore, CBP's investment strategy contemplates replacements or upgrades in these areas, as dictated by the evolving threat.

CBP investments in technology, border wall, and law enforcement personnel have been successful in increasing border security and contributing to OPCON of the border. Arizona serves as a good example. Prior to the investments of the past decade, the USBP **(b) (7)(E)**

**(b) (7)(E)**

CBP's investment strategy anticipates that while a border wall impedes the progress of illegal entries, it also recognizes that our adversaries will try to find alternative, more challenging and less advantageous methods to breach the border, despite the increased presence of walls and other barriers. CBP will **(b) (7)(E)**

**(b) (7)(E)**

**(b) (7)(E)** Consistent, informed situational awareness coupled with appropriate addition or enhancement of border roads for access and mobility enable USBP to respond appropriately to any breach or other illegal cross-border activity, including **(b) (7)(E)** As CBP tightens the security posture between the POEs, it anticipates **(b) (7)(E)**

**(b) (7)(E)**

Opioids, Narcotics, and Illegal Drugs

The growing epidemic of opioid misuse and abuse, combined with the prevalence of illicit opioids in the United States, is wreaking havoc in communities across the country. Drug overdoses are now the leading cause of accidental death in America. Almost one-third of these overdose deaths involved a synthetic opioid other than methadone, such as fentanyl and its analogues.[5]

Most of the illicit opioids in the United States are smuggled across the SWB or through international mail and express consignment hubs. Mexico has become the primary source of

---

[5] Provisional Counts of Drug Overdose Deaths, The Centers for Disease Control and Prevention's National Center for Health Statistics, as of 8/6/2017. *Note: Provisional overdose death counts for 2016-2017 are based on data available for analysis as of the date specified. Provisional counts may be incomplete, and causes of death may be pending investigation.*

FOR OFFICIAL USE ONLY

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-016

# V. Ensuring Accountability in Border Security

## A. Measuring OPCON and Security at the Immediate Border

In compliance with Executive Order 13767, CBP is reinstituting achieving OPCON between the POEs across the entirety of the Southern Border as its overarching goal to ensure that:

- Illegal entries across the U.S. border with Mexico are impeded and denied by sufficient walls, fencing, and other physical and natural barriers;
- USBP agents have a high level of situational awareness that includes near-term predictions of potential illegal entry attempts, as well as an ever-increasing capability to detect illegal entries as they occur; and
- USBP agents can respond efficiently to and interdict illegal entries of people or contraband by training, equipping, and enhancing availability of all agents.

CBP will measure OPCON directly via three elements: impedance and denial (including wall and other barriers, as well as measures of recidivism); situational awareness (including technologies that allow USBP to detect, identify, and track illegal entries, and intelligence capabilities); and law enforcement resolution (including the ability to respond to detections and make a final apprehension). Each of these elements will be evaluated and calculated via a host of subordinate measures currently in development. To aid in the transition to OPCON, DHS recently endorsed an Agency Priority Goal that will begin in FY 2018 and end in FY 2020, to allow for the establishment of a border security end state between POEs along the Southern Border by implementing the OPCON framework to articulate success and direct resources.

Concurrently, technological advances at the border over the past several years have increased situational awareness significantly. Among the three elements of OPCON, situational awareness is a major cornerstone. It combines domain awareness with intelligence data and other information to give USBP the best possible knowledge of how much illicit activity is occurring at the border and what that activity is. In turn, increased situational awareness has allowed USBP to begin pursuing modeling efforts based on the Department's more complete information about illegal entry attempts. (b) (7)(E)

(b) (7)(E)

(b) (7)(E) Increasing situational awareness narrows the gap between the known and unknown flow, and puts DHS in a position to build ever better observational estimates of border security.

In the interim, USBP will continue to explain its performance using its risk methodology via State of the Border reporting, in addition to reporting numerous measure results under the structure set out in the Government Performance and Results Act Modernization Act (GPRAMA) structure. USBP's most notable GPRAMA measures are the interdiction

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-038

| OFFICE | AUDIT | RECOMMENDATION | STATUS (AS OF OCTOBER 1, 2018) |
| --- | --- | --- | --- |
| | | | LSS, in coordination with OFO and OT, will conduct an analytical study to develop a risk matrix and statistically valid sample size to verify companies' compliance with the NRC regulation. CBP will use the results of the analytical study to frame the monitoring system. Directive 5290-015B will be updated to include the addition of a monitoring process to ensure compliance with mandated license verification policies and procedures.<br><br>CBP, using the results of the analytical study and a risked-based layered approach, will identify [redacted] |
| OS-LSSD | GAO-17-774SU, GAO-18-214 | Develop a robust system that identifies shipments of radiological material that pose the greatest risk and revise CBP's policies and procedures as necessary to verify licenses for these shipments. | CBP's Weapons of Mass Destruction Division (WMDD) has been realigned (operationally) from the Office of Intelligence (OI) to Laboratories and Scientific Services (LSS) within Operations Support (OS). Accordingly, LSS now has responsibility for Recommendations 1 and 3.<br><br>LSS, in coordination with OFO and OT, will conduct an analytical study to develop a risk matrix and statistically valid sample size to verify companies' compliance with the NRC regulation. CBP will use the results of the analytical study to frame the monitoring system. Directive 5290-015B will be updated to include the addition of a monitoring process to ensure compliance with mandated |

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

| OFFICE | AUDIT | RECOMMENDATION | STATUS (AS OF OCTOBER 1, 2018) |
|---|---|---|---|
| | | | license verification policies and procedures.<br><br>CBP, using the results of the analytical study and a risked-based layered approach, will identify shipments that are high risk or may pose a high risk (b) (7)(E) <br><br>(b) (7)(E) |
| ES-OFAM | GAO-18-11 | The Commissioner of CBP should develop and implement a policy and related guidance for documenting arrangements with landowners, as needed, on Border Patrol's maintenance of roads it uses to conduct its operations, and share these documented arrangements with its sectors. | Facilities Management and Engineering Office (FM&E) and USBP collaborated on the development of new processes, adapting existing guidance to current organizational needs, and utilized lessons learned to make the guidance successful for the organization. The updated policy defines coordination with landowners, where landowner agreements will be stored, POCs for questions, and procedures associated with the coordination with landowners for road maintenance. Additionally, recurring calls with the real estate and environmental team, USBP headquarter representative, Sector representatives, and program management have been developed to ensure transparent and clear communication of requirements, clearance status, and upcoming contract activities. The Real Property Requirements Management Policy was finalized on July 31, 2018. |
| USBP | GAO-18-11 | The Commissioner of CBP should clearly document the process and criteria for making decisions on funding non-owned operational requirements and communicate this process to Border Patrol sectors. | The USBP and FM&E team is finalizing the process for maintenance and repair of roads and have draft guidance for the field that has not been finalized. USBP and FM&E will work to complete the process by the end of October 2018. USBP and FM&E developed the first iteration of |

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-066

| OFFICE | AUDIT | RECOMMENDATION | STATUS |
|---|---|---|---|
| | | | received eight letters from different airports and airlines committing to implement biometric exit in collaboration with CBP.<br><br>CBP recognizes that a collaborative approach with the private sector is new, does not necessarily fit into current government acquisition and project management processes, and may present a certain uneasiness with oversight authorities with regard to project schedule and funding. Although CBP is confident that a partnership is the right approach for implementation of biometric exit, CBP will develop an internal contingency plan for funding and staffing the program in case airlines and airports do not partner with CBP. |
| OFO | OIG-18-83 | The Executive Assistant Commissioners for Office of Field Operations and Operations Support conduct an analysis to determine what additional staff, canines, x-ray scanning machines, and hand-held chemical analysis devices are needed to adequately address the threat from opioids arriving daily in the large volume of international mail. | OFO will collaborate with OS to conduct a cost-benefit analysis. The cost-benefit analysis will evaluate and determine additional staffing levels, canine teams, and technology that is necessary to address efficiently and adequately the threat (b) (7)(E) (b) (7)(E) It is important to note that significant equipment upgrades already have been made at the (b) (7)(E) since the OIG's July 2017 audit team visit. For example, as of November 7, 2017, the (b) (7)(E) (b) (7)(E) A permanent narcotics detection and analysis laboratory to replace the temporary |

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-083

| OFFICE | AUDIT | RECOMMENDATION | STATUS |
|--------|-------|----------------|--------|
| | | | laboratory is in the planning stage for the facility. |
| OFO | OIG-18-83 | The Executive Assistant Commissioners for Field Operations and Operations Support assign and dedicate canine teams as appropriate to detect opioids at the international mail facility on a daily basis. | The OFO (b) (7)(E) will work with the OFO Operations Directorate (OPS) to evaluate an increase in the total number of canine narcotic detector teams assigned at the (b) (7)(E) (b) (7)(E) As an interim solution, the (b) (7)(E) and OPS will explore alternatives to commercial kenneling, as a means of enhancing the port's ability to deploy more rapidly available canine teams to address immediate threats of illicit opioids in international mail. |
| OFO | OIG-18-83 | The Assistant Commissioner for the Office of Information and Technology (OIT) and Executive Assistant Commissioners for Field Operations and Operations Support jointly establish a process to inventory arriving international air mail received from USPS, scanned by CBP, and returned to USPS. | OFO, Manifest and Conveyance Security Division, in collaboration with the NII Division, already has identified the need for (b) (7)(E) NII equipment with the capacity to address the specific inventory issue as described in the recommendation, as well as (b) (7)(E) The procurement and acquisition process currently is being developed internally. |
| OFO | OIG-18-83 | The Executive Assistant Commissioners for Field Operations and Operations Support update CBP's International Mail Operations and Enforcement Handbook to reflect all types of arriving international mail. | OFO will revise CBP's International Mail Operations and Enforcement Handbook to reflect more fully the current operational conditions in relation to (b) (7)(E) of international mail arriving, increasing volumes of international mail, and the applicability of advance electronic data to (b) (7)(E) inbound international mail. |
| OFO | OIG-18-83 | The Executive Assistant Commissioners for Field Operations and Operations Support perform and document periodic 'Mail Flex' operations, including use of canine teams, to better determine the size and scope of the threat inherent in specific | The OFO (b) (7)(E) is collaborating with OFO's National Targeting Center-Cargo, OPS, HSI, U.S. Postal Inspection Services, and state and local law enforcement agencies, to develop and implement (b) (7)(E) |

FOR OFFICIAL USE ONLY
WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

BSIP-084